Adam M. Apton (SBN 316506)
LEVI & KORSINSKY, LLP
75 Broadway, Suite 202
San Francisco, California 94111
Telephone: (415) 373-1671

*Attorneys for Lead Plaintiff Hsiu-Mei Yu
and Lead Counsel for the Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE COINBASE GLOBAL, INC. SECURITIES LITIGATION | Master File No. 3:21-cv-05634-VC |
| | **CONSOLIDATED CLASS ACTION COMPLAINT** |

Lead Plaintiff Hsiu-Mei Yu ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through her attorneys, allege the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys. Such investigation included a review of Defendants' public statements and announcements, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Coinbase Global, Inc. ("Coinbase"), securities analysts' reports, news stories, and circumstances alleged herein.

Plaintiff believes that additional substantial evidentiary support exists for the allegations set forth herein and will be available after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    Plaintiff brings this class action pursuant to Sections 11, 12, and 15 of the Securities Act of 1933 (the "Securities Act") on behalf of herself and all other persons or entities who purchased or otherwise acquired Coinbase's publicly-traded common stock pursuant and/or

traceable to the registration statement and prospectuses (collectively, the "Registration Statement" as defined below) on or after April 14, 2021 (the "Direct Listing").

2.      On April 14, 2021, Coinbase became the first crypto company to go public. It offered investors an opportunity to invest in "crypto" but with the stability and security of an established large-cap company thanks to Coinbase's proprietary and trusted "platform," "significant scale," and, most importantly, proven "flywheel" growth strategy. These fundamental components of Coinbase's business, while once cornerstones of its operations, were misrepresented in the Registration Statement. In the months leading up to the Direct Listing, Defendants generated a massive influx of new users to Coinbase's "platform" through a heavy advertising and promotional campaign. These new users created an unprecedented spike in volume and trading activity, causing a breakdown in its operations, "platform" disruptions, and a rupture in the "flywheel" cycle that had been responsible for the company's historical growth. Defendants' efforts to increase Coinbase's numbers in advance of the Direct Listing backfired, leaving the company and its newfound investors damaged and vulnerable to the competition.

3.      Coinbase described its "platform" in the Registration Statement as "a complementary suite of products and services . . . powered by a robust backend technology system." It was integral to the company's growth strategy, which was represented as a "virtuous cycle" where new users increased liquidity that would, in turn, provide for the listing of new assets that could then be used to attract additional users and start the cycle all over again. As Coinbase stated in the Registration Statement, this cycle was a "powerful flywheel" that had "work[ed] effectively" to allow it to "grow[] rapidly" with "minimal outbound sales and marketing effort[s]." Indeed, since its inception, "over 90% of [Coinbase's] retail users had found [the company] organically or through word-of-mouth."

4.      In 3Q20[1], Defendants pivoted away from Coinbase's "organic[]" and "word-of-mouth" marketing and began a significant promotional and advertising campaign as they planned for the upcoming Direct Listing. Coinbase's "sales and marketing expenses," which primarily

---

[1] "3Q20" refers to the third quarter of fiscal year 2020. Plaintiff uses this format in the Complaint to refer to Coinbase's fiscal quarters.

Consolidated Class Action Complaint                              Master Case No. 3:21-cv-05634-VC

1   included "costs related to customer acquisition, advertising and marketing programs," increased

2   from $24 million in 2019 to $57 million in 2020. Nearly half of these expenses were incurred in

3   4Q20 alone. In 1Q21 and 2Q21 just prior to and during the Direct Listing, these expenses

4   skyrocketed to $118 million and $196 million. Two of Coinbase's key metrics, "Assets on Platform"

5   and "Trading Volume," illustrated the results of Defendants' marketing efforts. Between 3Q20 and

6   4Q20, these metrics spiked with both assets and volume on Coinbase's "platform" nearly tripling

7   and doubling, respectively, and climbing even higher in 2021.

8          5.     The increased volume on Coinbase's "platform" ruptured its "flywheel" cycle as the

9   company encountered increasing service disruptions and delays in terms of adding new crypto

10  assets. In 2019, Coinbase had a total of six "unanticipated system disruptions," which the company

11  described as "disruptions" that "typically last from minutes up to a few hours and are caused by

12  periods of significant unexpected trading activity that cause delays in [its] trading service." In 2020,

13  the number of Coinbase's "unanticipated system disruptions" doubled, rising to twelve; and in 1Q21

14  alone, Coinbase had five. Additionally, notwithstanding the wild popularity and demand for

15  Dogecoin, it was markedly absent from Coinbase's "platform" while available through many of the

16  company's competitors.

17         6.     Despite the strains of Defendants' promotional campaign, they described Coinbase's

18  operations, "platform," and "flywheel" growth strategy without any reservations. This

19  misrepresented to investors that the fundamentals behind Coinbase's historical success were still in

20  place and functioning as normal. Under this misrepresentation, Defendants listed nearly 115 million

21  shares of its Class A common stock on the Nasdaq Global Select Market allowing several of the

22  Individual Defendants (defined below) to immediately sell hundreds of millions of dollars of stock

23  to the public—$711,975,997 to be exact.

24         7.     Due to Defendants' promotional campaign and the damaged state of Coinbase's

25  "platform" and "flywheel" growth strategy, Plaintiff and other public investors in Coinbase who

26  purchased shares in the Direct Listing unknowingly made an investment that was materially

27  different and substantially riskier than what had been represented in the Registration Statement.

28

Consolidated Class Action Complaint                    Master Case No. 3:21-cv-05634-VC

8.      Defendants violated Sections 11, 12, and 15 of the Securities Act and are liable for damages as a result.

## II.      JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§77k, 77l(a)(2), and 77o, respectively).

10.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 22 of the Securities Act (15 U.S.C. §77v).

11.      Venue is proper in this Judicial District pursuant to 28 U.S. §1391.

12.      In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.      PARTIES

### A.      Lead Plaintiff

13.      Hsiu-Mei Yu, as set forth in her previously filed certification (ECF No. 17-2), incorporated by reference herein, purchased or otherwise acquired Coinbase common stock pursuant and/or traceable to the Registration Statement issued in connection with Coinbase's Direct Listing, and suffered damages as a result of Defendants' violations of the federal securities laws.

### B.      Coinbase

14.      Coinbase is incorporated under the laws of Delaware.

15.      Coinbase formerly maintained a corporate headquarters at 548 Market Street, San Francisco, California. In May 2020, the company decided to become a "remote-first" company, meaning that its employees would work primarily from remote locations. Notwithstanding the foregoing, Coinbase maintained corporate offices in the San Francisco Bay Area at the time of the Direct Listing, including San Francisco and Redwood City.

16.      Coinbase filed its initial registration statement on Form S-1 on February 25, 2021 for the resale of up to 114,850,769 shares of its Class A common stock.

4

17.     Coinbase amended and/or supplemented its initial registration statement with the following:

      a.     Registration Statement filed on Form S-1 on February 25, 2021;

      b.     Amended Registration Statement filed on Form S-1/A on March 17, 2021;

      c.     Amended Registration Statement filed on Form S-1/A on March 23, 2021; and

      d.     Prospectus Supplement filed on April 14, 2021.

18.     Coinbase's initial registration statement on Form S-1 on February 25, 2021 along with the additional amendments and/or supplements listed in the immediately preceding paragraph are referred to herein collectively as the "Registration Statement."

19.     On April 1, 2021, the SEC declared Coinbase's Registration Statement effective. This was the one and only registration statement in existence for Coinbase at the time.

20.     On April 14, 2021, Coinbase shares began trading on the NASDAQ under the ticker symbol "COIN" reaching prices as high as $429.54 per share. All shares that began trading on the NASDAQ as of April 14, 2021 were registered under and/or traceable to the Registration Statement.

21.     Coinbase's shares did not trade on NASDAQ prior to April 14, 2021.

22.     There was no public market for Coinbase's capital stock prior to the Direct Listing.

23.     On July 22, 2021, the date this action was commenced, Coinbase's stock closed at $226.08 per share.

**C.     Individual Defendants**

24.     Defendant Brian Armstrong ("Armstrong") is, and was at the time of the Direct Listing, Coinbase's Chief Executive Officer and Chairman of the Board of Directors (the "Board").

25.     Armstrong reviewed, approved, and made the statements in the Registration Statement.

26.     Armstrong signed the Registration Statement.

27.     At the time of the Direct Listing, Armstrong owned 2,753,924 Class A shares of Coinbase common stock and 36,851,833 Class B shares of common stock[2] and, collectively, held 21.5% of Coinbase's voting power.

28.     Defendant Alesia J. Haas ("Haas") is, and was at the time of the Direct Listing, Coinbase's Chief Financial Officer.

29.     Haas reviewed, approved, and made the statements in the Registration Statement.

30.     Haas signed the Registration Statement.

31.     At the time of the Direct Listing, Haas owned 511,000 Class A shares of Coinbase common stock.

32.     Defendant Jennifer N. Jones ("Jones") served as Coinbase's Chief Accounting Officer at the time of the Direct Listing.

33.     Jones reviewed, approved, and made the statements in the Registration Statement.

34.     Jones signed the Registration Statement.

35.     At the time of the Direct Listing, Jones owned 230,385 Class A shares of Coinbase common stock.

36.     Defendant Marc L. Andreessen ("Andreessen") is, and was at all relevant times, a director of Coinbase.

37.     Andreessen reviewed, approved, and made the statements in the Registration Statement.

38.     Andreessen signed the Registration Statement.

39.     At the time of the Direct Listing, Andreessen owned 5,516,037 Class A shares of Coinbase common stock and 23,961,498 Class B shares of common stock and, collectively, held 14.1% of Coinbase's voting power.

40.     Defendant Frederick Ernest Ehrsam III ("Ehrsam") is, and was at all relevant times, a director of Coinbase.

_____

[2] Coinbase's Class B common stock has twenty votes per share whereas Class A common stock has just one. Class B shares are convertible into Class A shares at any time at the discretion of the shareholder.

Consolidated Class Action Complaint                    Master Case No. 3:21-cv-05634-VC

1    41.    Ehrsam reviewed, approved, and made the statements in the Registration Statement.

2    42.    Ehrsam signed the Registration Statement.

3    43.    At the time of the Direct Listing, Ehrsam owned 2,570,459 Class A shares of
4  Coinbase common stock and 15,114,503 Class B shares of common stock and, collectively, held
5  8.9% of Coinbase's voting power .

6    44.    Defendant Kathryn Haun ("Haun") is, and was at all relevant times, a director of
7  Coinbase.

8    45.    Haun reviewed, approved, and made the statements in the Registration Statement.

9    46.    Haun signed the Registration Statement.

10    47.    At the time of the Direct Listing, Haun owned 181,000 Class A shares of Coinbase
11  common stock and 286,854 Class B shares of common stock and, collectively, held <1% of
12  Coinbase's voting power.

13    48.    Defendant Kelly Kramer ("Kramer") is, and was at all relevant times, a director of
14  Coinbase.

15    49.    Kramer reviewed, approved, and made the statements in the Registration Statement.

16    50.    Kramer signed the Registration Statement.

17    51.    Defendant Gokul Rajaram ("Rajaram") is, and was at all relevant times, a director of
18  Coinbase.

19    52.    Rajaram reviewed, approved, and made the statements in the Registration Statement.

20    53.    Rajaram signed the Registration Statement.

21    54.    Defendant Fred Wilson ("Wilson") is, and was at all relevant times, a director of
22  Coinbase.

23    55.    Wilson reviewed, approved, and made the statements in the Registration Statement.

24    56.    Wilson signed the Registration Statement.

25    57.    At the time of the Direct Listing, Wilson owned 13,902,324 Class B shares of
26  common stock and held 8.9% of Coinbase's voting power.

27

28

7

58. Defendants Armstrong, Haas, Jones, Andreessen, Ehrsam, Haun, Kramer, Rajaram, and Wilson are collectively referred to herein as the "Individual Defendants." The Individual Defendants ran Coinbase as hands-on executives, manager and/or directors, overseeing its operations, finances, and business. The Individual Defendants made the materially false and misleading statements described herein and each had intimate knowledge about core aspects of Coinbase's financial and business operations. The Individual Defendants were also intimately involved in deciding which disclosures would be made by Coinbase. Because of their positions and access to material non-public information available to them, the Individual Defendants knew or should have known that the adverse facts specified herein had not been disclosed to the public, and that the positive representations which were being made were then materially false and/or misleading.

59. The Individual Defendants, because of their positions at Coinbase, possessed the power and authority to control the contents of its reports to the SEC, press releases, presentations to securities analysts, money and portfolio managers, institutional and individual investors, and industry experts and/or practitioners at conferences and other events. The Individual Defendants were provided with copies of Coinbase's Registration Statement alleged herein to be misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.

60. The defendants listed above in this Section of the Complaint are collectively referred to herein as the "Individual Defendants."

61. Coinbase and the Individual Defendants are collectively referred to herein as "Defendants."

IV. **SUBSTANTIVE ALLEGATIONS**

A. **Coinbase's "Platform" and "Flywheel" Strategy Attracted Investors.**

62. Coinbase operates a "platform" that provides its users with an exchange to buy and sell cryptocurrencies. The "platform" is the medium through which Coinbase provides its users with its "complementary suite of products and services" that are responsible for generating the company's

8

revenue. Coinbase's "platform" is "powered" by a proprietary "robust backend technology system that enables [it] to develop, launch, and market scalable new products and services."

63.   Coinbase's primary growth strategy was to implement and maintain what it referred to as its "flywheel" strategy. The "flywheel" consisted of three components: (1) expanding its "platform" by increasing the availability of crypto assets; (2) using the availability of crypto assets to attract additional users and generate growth in transactions and liquidity; and (3) leveraging the additional users and liquidity to further expand its "platform" with even more crypto asset availability, which would drive new users to its "platform" and restart the cycle all over again.

64.   Coinbase discussed its "flywheel" repeatedly in the Registration Statement. According to Coinbase, the "flywheel" was a "virtuous cycle" and described it as follows: "Our unique approach draws retail users, institutions, and ecosystem partners to our platform, creating a **_powerful flywheel_**: retail users and institutions store assets and drive liquidity, enabling us to expand the depth and breadth of crypto assets that we offer, and launch new, innovative products and services that attract new customers" (emphasis added).

65.   When discussing Coinbase's "flywheel," the Registration Statement stated further that:

> Retail users and institutions come to Coinbase to discover and access the cryptoeconomy because our platform is safe, trusted, and easy to use. Expanding the depth and breadth of crypto assets that we support drives growth in transactions and assets on our platform, and enhances liquidity, in turn attracting more retail users and institutions. Our superior scale enables ecosystem partners such as asset issuers, merchants, and application developers to connect with millions of customers participating in the cryptoeconomy around the world. As customers and activity increase, we develop a deeper understanding of each customer's needs, allowing us to intelligently design, develop, and launch new innovative products. **_These products enhance the value of our platform, in turn attracting more customers and driving transactions, assets, and liquidity in a virtuous cycle_**.

(emphasis added)

66.     Coinbase provided investors with the following depiction of its "flywheel" to investors:



67.     Defendants attributed Coinbase's operational success to the "flywheel." In pertinent part, the Registration Statement stated:

> We have seen this flywheel work effectively across our business and we have grown rapidly as a result. As of December 31, 2020, our customers had traded over $456 billion on our platform since inception and stored over $90 billion worth of assets across our platform. This growth has come with minimal outbound sales and marketing effort – since inception over 90% of our retail users had found us organically or through word-of-mouth.
>
> Since inception through December 31, 2020, we generated over $3.4 billion in total revenue, largely from transaction fees that we earn from volume-based trades on our platform by retail users and institutions. For the year ended December 31, 2020, transaction revenue represented over 96% of our net revenue. ***We have leveraged the strength of our trading business to scale and broaden our platform by investing in our flywheel to launch new products and services and grow the ecosystem***.

(emphasis added)

68.     Market analysts identified Coinbase's "flywheel" strategy as a material component to its overall growth strategy. For example:

a.     On April 15, 2021, Loop Capital Markets initiated coverage with a "buy" rating and price target of $394 per share, reporting that: "the company is

Consolidated Class Action Complaint                    Master Case No. 3:21-cv-05634-VC

focused on growing subscription and services revenue through additional product rollouts in the cryptoeconomy . . . . As more customers come to the platform, it will provide Coinbase with additional investment dollars to pour into new products on the platform… forming a virtuous circle."

b.  On April 20, 2021, Rosenblatt Securities initiated coverage with a "buy" rating and price target of $450 per share, focusing on the "flywheel" in its report by, *inter alia*, providing investors with the "flywheel" depiction provided above as well as explaining that it "allows Coinbase to launch new, innovative products and services to attract even more new customers to its platform" which adds to the company's "scale and leadership position."

c.  On May 10, 2021, Oppenheimer initiated coverage with a "buy" rating and price target of $434 per share, emphasizing the importance of Coinbase's "flywheel" growth strategy and explaining that: "When more retail users and institutions trade crypto and store assets in Coinbase's custody, it enables the expansion of crypto assets. With the increased users and liquidity in the platform, it draws ecosystem partners to connect with the customers to create new products. This flywheel creates a powerful virtuous cycle to the platform."

**B.  Defendants Boosted Operations and Growth Prior to the Direct Listing.**

69.  Historically, "[Coinbase] spent less than 5% of net revenue on sales and marketing, and since inception, over 90% of [its] retail users had found [the company] organically or through word-of-mouth." Defendants departed from this customer outreach approach though as Coinbase began preparing for the Direct Listing. Coinbase commenced a substantial promotional and advertising campaign in 3Q20 contemporaneously with the filing of its preliminary draft registration statement. This is demonstrated by the sudden and sharp rise in Coinbase's "technology and development expenses" and "sales and marketing expenses" preceding the Direct Listing. Indeed, Coinbase's "sales and marketing expenses" as a percentage of net revenue increased from its

traditional 5% level in 2020 to 7.3% in 1Q21 and then 9.6% in 2Q21 (*i.e.*, the quarter in which the Direct Listing occurred).

70.     Coinbase's "technology and development expenses include[d] costs incurred in operating, maintaining, and enhancing [its] platform, including network, website hosting, and infrastructure costs." Coinbase's "technology and development expenses" increased year-over-year from $185 million in 2019 to $272 million in 2020. According to Coinbase's Registration Statement, the increase in "technology and development expenses" was "primarily driven by a $53.5 million increase in personnel-related costs due to a 59% increase in overall headcount, a $13.6 million increase in software licenses, and a $13.1 million increase in website hosting costs to support the growth of our platform."

71.     Coinbase's "sales and marketing expenses primarily include[d] costs related to customer acquisition, advertising and marketing programs . . . ." Coinbase's "sales and marketing expenses" increased year-over-year from $24 million in 2019 to $57 million in 2020. According to Coinbase's Registration Statement, the increase in "sales and marketing expenses" was "primarily due to a $23.3 million increase in digital advertising spend, a $5.0 million increase in personnel-related costs, and a $3.9 million increase in customer referral and promotion fees." Personnel-related costs included the hiring of additional customer support agents necessitated by a sharp increase in inquiries. Whereas Coinbase received approximately 25,000 customer support inquiries per week in 2020, they jumped to "100,000 or more" per week in 1Q21.

Consolidated Class Action Complaint                     Master Case No. 3:21-cv-05634-VC

72.     Coinbase's rise in "technology and development expenses" and "sales and marketing expenses" began in 3Q20, when Defendants filed the preliminary draft registration statement, and continued through 2Q21, the quarter in which the Direct Listing occurred. The following table provides the quarterly "technology and development" and "sales and marketing" expenses along with net revenue (in thousands) for FY2020 and the first half of FY2021:

|  | Jun. 30, 2021 | Mar. 31, 2021 | Dec. 31, 2020 | Sep. 30, 2020 | Jun. 30, 2020 | Mar. 31, 2020 |
|---|---|---|---|---|---|---|
| Technology and development | $291,461 | $184,225 | $90,498 | $73,319 | $60,777 | $47,138 |
| Sales and marketing | $195,733 | $117,990 | $23,501 | $11,977 | $11,383 | $9,921 |
| Net Revenue | $2,033,011 | $1,596,981 | $497,091 | $286,663 | $178,331 | $179,082 |

73.     Coinbase stated in the Registration Statement that its "technology and development expenses remained relatively constant" in 2019 and increased in 2020 due to "increased headcount and increased costs due to the growth of our platform." It stated further that "sales and marketing expenses" had "trended upwards" primarily because of "the timing and magnitude of online advertising campaigns to increase traffic to [Coinbase's] platform." This trend continued in 1Q21 and 2Q21 due to increases in "digital advertising spend" and "customer referral and promotion fees."

74.     Coinbase utilized "key business metrics" to measure its operational growth. Two of these metrics, in particular, demonstrate the sudden and sharp increase in operations and growth just prior to Coinbase's Direct Listing: "Assets on Platform" and "Trading Volume."

75.     Coinbase described "Assets on Platform" as follows: "Assets on Platform is a measure of the scale of total value held on our platform. We believe Assets on Platform reflects the trusted nature of our platform and a monetization opportunity. Assets on Platform generate fees that are recorded as subscription and services revenue when customers engage with these products. The value of Assets on Platform is driven by three factors – the price, quantity, and type of crypto assets held by customers on our platform."

13

76.     Coinbase's "Assets on Platform" rose sharply in advance of the Direct Listing. As stated in the Registration Statement, "Assets on Platform has grown over the longer term from $7 billion to $17 billion to $90 billion as of December 31, 2018, 2019, and 2020, respectively, driven by growth in the price, quantity, and types of crypto assets we support."

77.     Coinbase also stated that its "Assets on Platform" "represented 11.1% of the total market capitalization of crypto assets, increasing from 8.3% and 4.5% as of December 31, 2019 and December 31, 2018, respectively," and that "[i]n 2020, [its] Assets on Platform initially decreased before subsequently increasing driven by growth in the quantity, price, and breadth of crypto assets we support."

78.     Coinbase provided the following chart of its "Assets on Platform" in the Registration Statement:



Assets on Platform and Crypto Market Capitalization

79.     As demonstrated above, Coinbase's "Assets on Platform" increased dramatically in 4Q20, nearly tripling in dollar amount from $36 billion to $90 billion. This trend continued in 1Q21, rising from $90 billion to $223 billion.

80.     Coinbase's "Trading Volume" followed a similar track, rising sharply in 4Q20. Coinbase provided the following chart of the "Trading Volume" on its platform in the Registration Statement:

### Trading Volume and Crypto Asset Volatility



81.     Coinbase's "Trading Volume" effectively doubled between 3Q20 and 4Q20, rising from $45 billion to $89 billion. This trend continued in 1Q21 jumping from $89 billion to $335 billion and in 2Q21 rising to $462 billion. Coinbase attributed its rise in "Trading Volume" during this period to "the addition of over 20 crypto assets, including multiple DeFi crypto assets . . . ."

82.     Coinbase's operational growth in 4Q20 and 1Q21 was substantially greater than its growth prior to 4Q20. As demonstrated above, Coinbase's "Assets on Platform" remained relatively stagnant between 1Q18 and 1Q20, starting at $13 billion and ending at $17 billion. Additionally, its "Trading Volume" was similarly consistent, remaining at or well below $30 billion (except for 1Q18 where it reached $56 billion).

Consolidated Class Action Complaint                    Master Case No. 3:21-cv-05634-VC

1

      **C.**    **The "Flywheel" Strategy Was Unworkable.**

2

     83.    Coinbase's "flywheel" strategy was viable only insofar as its "platform" could

3

handle the trading volume generated by its users. Thus, when Defendants dramatically increased

4

Coinbase's number of users in preparation for the Direct Listing, the "platform" was no longer able

5

to sustain the volume necessary for the successful execution of Coinbase's core "flywheel" growth

6

strategy. Coinbase's influx of new users and trading volume overpowered its "platform" and

7

rendered its core "flywheel" strategy unworkable. Instead of adding liquidity to the "platform" and

8

allowing Coinbase to expand its cryptocurrency offerings, the rush of new users resulted in

9

significant service problems and interfered with Coinbase's adoption of in-demand digital assets.

10

     84.    The incapacity of Coinbase's "flywheel" strategy became evident on May 13, 2021

11

when, Coinbase reported its earnings for 1Q21 after market hours. Revenue and earnings for the

12

quarter were $1.801 billion and $3.05 per share, which missed analyst expectations of $1.81 billion

13

and $3.07 per share.

14

     85.    Coinbase also reported increased "unanticipated system disruptions" to its

15

"platform," which the company described as "system disruptions" that "typically last from minutes

16

up to a few hours and are caused by periods of significant unexpected trading activity that cause

17

delays in [its] trading service." During "unanticipated system disruptions," Coinbase fulfilled

18

customer transactions with its own crypto assets as an "accommodation" to its users. The revenue

19

from the transactions was recorded as "other revenue" while the cost of the crypto assets used to

20

fulfill the transaction was recorded as "other operating expense."

21

     86.    Between FY2019 and FY2020, Coinbase's "unanticipated system disruptions"

22

increased from six to 12. The increase in "unanticipated system disruptions" from FY2019 to

23

FY2020 was "due to greater trading activity on Coinbase."

24

     87.    In 1Q21, Coinbase experienced "five unanticipated system disruptions," nearly the

25

entire number of disruptions experienced in 2019 altogether and almost half of all the disruptions in

26

2020. While Coinbase generated $105.5 million in "other revenue" from sales during these

27

disruptions, its "other operating expenses" for the quarter included an increase of $176.1 million in

28

Consolidated Class Action Complaint           Master Case No. 3:21-cv-05634-VC

"costs associated with crypto assets sold in order to fulfill customer accommodation transactions" during the "unanticipated system disruptions." This represented approximately 22.8% of Coinbase's overall net income for the quarter.

88.     Coinbase also reported delays in terms of expanding its "platform" to include additional cryptocurrencies. Dogecoin, in particular, would not be available on Coinbase's "platform" for at least another "six to eight weeks." In pertinent part, Armstrong stated during Coinbase's earnings conference call:

> And so we are putting a lot of work and thought into how do we accelerate our pace of asset addition. And one of those is Doge, as you mentioned, which has been getting a lot of attention recently. So to answer your question directly, ***we plan to list Doge in the next six to eight weeks***. And then more broadly, we are going to be focused on how we can accelerate asset addition in the future.

(emphasis added)

89.     Coinbase's delay in terms of listing Dogecoin was significant given its popularity amongst cryptocurrency investors and its marked absence from Coinbase's "platform." Indeed, CoinDesk had previously reported on April 16, 2021 that Coinbase was "missing out on the latest frenzy" caused by Dogecoin. In pertinent part, CoinDesk reported that: "New shareholders of Coinbase might wonder, however, about the competitive disadvantage given that some of the exchange's biggest global rivals have listed DOGE and appear to be lapping up the sudden spike in trading." CoinDesk stated further that, "[a]ccording to the website CoinGecko, most of the trading volume in dogecoin in the past 24 hours has come from the big exchanges Binance, OKEx and Huobi."

90.     Coinbase's inability to meet analyst expectations, the fragility of its "platform," and the unavailability of popular cryptocurrencies signaled to analysts and investors the unworkability of its core "flywheel" strategy. In response, numerous analysts immediately began to question Coinbase's vulnerability to competition, including:

a.     On May 13, 2021, *Investor's Business Daily* reported in pertinent part that "Coinbase stock slipped after hours on Thursday after the cryptocurrency exchange reported first-quarter results that slightly missed estimates." The

17

report explained that, "The results arrived as the cryptocurrency exchange, the U.S.' largest, faces questions about rival crypto platforms, widening its product offerings and how it might put its cash to use." It also highlighted concerns over competition, referring to statements made by Coinbase in its earnings release: "'Competition is increasing as new market entrants join the cryptoeconomy every month,' Coinbase said in a letter to shareholders on Thursday. 'Our competitors are supporting certain crypto assets that are experiencing large trading volume and growth in market capitalization that we do not currently support, as well as offering new products and services that we do not offer'";

b.  On May 14, 2021, *The New York Times* reported in pertinent part that Coinbase's "rivals were swarming the market and increasing competition" and that "[t]he company has been spending heavily on marketing and development to keep ahead of its competitors"; and

c.  On May 14, 2021, *Blockchain.News* reported that Coinbase's stock had declined by 6.53% following the company's earnings announcement. The report also noted Coinbase's "plans to list Dogecoin within the next eight weeks and increase the speed at which the platform releases new products."

**D.  False and/or Materially Misleading Statements**

91.  The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

92.  In the "Prospectus Summary" section of the Registration Statement, Coinbase described its "platform" and "flywheel" growth strategy as follows:

> We power the cryptoeconomy by combining the best of both emerging blockchain technology and traditional finance to create trusted and easy-to-use products for the industry. We have built a robust backend technology platform to support the global, real-time, and 24/7/365 demands of crypto asset markets. We invest heavily in

18

regulatory compliance by working with regulators around the world to shape policy, and have pioneered industry-leading security practices for safeguarding crypto assets. Our early focus on trust and usability has allowed us to become the primary on-ramp to the cryptoeconomy from the fiat-based financial system.

Our unique approach draws retail users, institutions, and ecosystem partners to our platform, creating a powerful flywheel: retail users and institutions store assets and drive liquidity, enabling us to expand the depth and breadth of crypto assets that we offer, and launch new, innovative products and services that attract new customers. Our scale and leadership position draws ecosystem partners to connect with our millions of customers around the world, further enhancing the value of our platform.

This self-reinforcing dynamic is enabled by our culture of repeatable innovation and continuous investment in our proprietary technology platform that is purpose built to address the unique engineering, cybersecurity, compliance, and usability challenges of directly interacting with blockchain protocols. With every turn of our flywheel, we develop a deeper understanding of our customers' needs and leverage our scalable platform to intelligently design, develop, launch, and market new, innovative products and services to our customers. This allows us to build a more tailored suite of products and services and enhances the value of our platform over time. By providing the necessary infrastructure and distribution for our current and future ecosystem partners to build and extend their reach, we also foster the growth of the ecosystem.

93.     Coinbase emphasized the strengths of its "platform" as a competitive advantage, stating in pertinent part that:

We have developed a complementary suite of products and services that are designed to meet the distinct needs of our customers as they transact in the cryptoeconomy. Our customers – retail users, institutions, and ecosystem partners – come together on our platform to create a powerful flywheel for our business.

Our platform and flywheel are powered by a robust backend technology system that enables us to develop, launch, and market scalable new products and services. Our technology platform includes the following elements:

- **15+ native blockchain integrations and counting.** We have developed custom technology and processes to directly integrate with over 15 blockchain protocols and efficiently support new protocols.

- **Advanced cybersecurity and cryptography technology.** We have pioneered industry-leading standards for managing private cryptographic keys and use sophisticated cybersecurity technologies such as multi-party computation to safeguard a wide range of crypto assets.

19

  &bull; ***Proprietary crypto compliance infrastructure.*** We have built bespoke transaction monitoring systems to analyze crypto asset transactions in real-time on the blockchain, allowing us to support new products and services.

  &bull; ***Powerful product experiences.*** Investments in our technology platform give us the ability to create unique product experiences for our customers that allow them to easily participate in technically complex parts of the cryptoeconomy.

. . .

  &bull; ***We have a robust technology platform that enables unique product experiences for our industry.*** Our custom technology platform is built to deal with the real-time, global and 24/7/365 nature of crypto asset markets, enabling us to rapidly research, develop, and launch new products and features.

  94. Coinbase reiterated the strength of its "flywheel" growth strategy later in the Registration Statement in the "MD&A" section, stating in pertinent part:

> Our unique approach draws retail users, institutions, and ecosystem partners to our platform, creating a powerful flywheel: retail users and institutions store assets and drive liquidity, enabling us to expand the depth and breadth of crypto assets that we offer, and launch new, innovative products and services that attract new customers. Our scale and leadership position draws ecosystem partners to connect with our millions of customers around the world, further enhancing the value of our platform.

> This self-reinforcing dynamic is enabled by our culture of repeatable innovation and continuous investment in our proprietary technology platform that is purpose built to address the unique engineering, cybersecurity, compliance, and usability challenges of directly interacting with blockchain protocols. With every turn of our flywheel, we develop a deeper understanding of our customers' needs and leverage our scalable platform to intelligently design, develop, launch, and market new, innovative products and services to our customers. This allows us to build a more tailored suite of products and services and enhances the value of our platform over time. By providing the necessary infrastructure and distribution for our current and future ecosystem partners to build and extend their reach, we also foster the growth of the ecosystem.

> We have grown quickly and in a capital-efficient manner since our founding. However, similar to the evolution of the internet, e-commerce, and prior paradigm shifts in technology, our journey has not been linear. Due to the highly volatile nature of crypto asset prices and trading activity, historically our operating results have, and we expect will, continue to fluctuate significantly from quarter to quarter in line with market sentiment and trading activity. . . . .

95.     Coinbase emphasized the importance of its "flywheel" growth strategy, stating in the Registration Statement that:

> We have seen this flywheel work effectively across our business and we have grown rapidly as a result. As of December 31, 2020, our customers had traded over $456 billion on our platform since inception and stored over $90 billion worth of assets across our platform. This growth has come with minimal outbound sales and marketing effort — since inception over 90% of our retail users had found us organically or through word-of-mouth.

96.     Coinbase described its "flywheel" growth strategy in detail by providing the following statement when discussing its "platform":

> We have developed a complementary suite of products and services that are designed to meet the distinct needs of our customers as they transact in the cryptoeconomy. All of our customer-facing products and services are powered by a robust backend technology system that enables us to develop, launch, and market scalable new products and services.
>
> Our customers – retail users, institutions, and ecosystem partners – come together on our platform to create a powerful flywheel for our business.
>
> Retail users and institutions come to Coinbase to discover and access the cryptoeconomy because our platform is safe, trusted, and easy to use. Expanding the depth and breadth of crypto assets that we support drives growth in transactions and assets on our platform, and enhances liquidity, in turn attracting more retail users and institutions. Our superior scale enables ecosystem partners such as asset issuers, merchants, and application developers to connect with millions of customers participating in the cryptoeconomy around the world. As customers and activity increase, we develop a deeper understanding of each customer's needs, allowing us to intelligently design, develop, and launch new innovative products. These products enhance the value of our platform, in turn attracting more customers and driving transactions, assets, and liquidity in a virtuous cycle.

1
2
3
4
5
6
7
8



9
10
11
12
13
14
15

Crypto asset markets are natively digital, real-time, and operate globally on a 24/7/365 basis. The "always on" nature of the cryptoeconomy demands a more scalable and higher throughput technical architecture. Our proprietary platform is purpose-built to support the unique demands of the cryptoeconomy, and is built on top of modern technology designed specifically to address the unique engineering, cybersecurity, compliance, and usability challenges of emerging blockchain technology, while seamlessly connecting to legacy technology and financial systems. This infrastructure is highly extensible and investments we have made in platform-level capabilities allow us to quickly launch new products and services that accelerate our flywheel.

16      97.     The statements identified above in Paragraphs 92-96 were false and/or materially
17   misleading because they described Coinbase's key operational and growth strategies without also
18   disclosing that they had been materially weakened and disrupted by Defendants' promotional
19   campaign prior to and during the Direct Listing.

20      98.     As alleged in Section IV.A., *supra*, Coinbase's "platform" and "flywheel" growth
21   strategy were of central importance to the company's overall business and had been responsible for
22   its historical growth and operational success. The Registration Statement repeatedly referred to these
23   components of Coinbase's business as the cornerstones of its operations and integral to the growth
24   it had achieved over the better part of the past decade prior to the Direct Listing. These components
25   of Coinbase's business were material to investors, as demonstrated by the attention they received
26   from analysts who were covering Coinbase prior to and during the Direct Listing (*e.g.*, Loop Capital,
27   Rosenblatt Securities, Oppenheimer).

28

Consolidated Class Action Complaint                    Master Case No. 3:21-cv-05634-VC

99.     However, contrary to the above statements in the Registration Statement, these components of Coinbase's operations had been adversely impacted by Defendants' promotional campaign. As alleged in Section IV.B., *supra*, Defendants implemented an intense advertising and marketing push in advance of the Direct Listing that doubled and tripled trading volume and assets on Coinbase's "platform," respectively. This marked an abrupt and significant rise in "platform" traffic which had historically been moderately flat over the preceding two years. The strain on Coinbase's "platform" resulted in increased system disruptions and delayed crypto asset offerings that interfered with its ability to compete with the competition, which only came to light when Coinbase reported its earnings for 1Q21, as alleged in Section IV.C., *supra*.

100.     Coinbase also materially misled investors when discussing its customer outreach strategies, stating in pertinent part that:

> For the year ended December 31, 2020, we spent less than 5% of net revenue on sales and marketing, and since inception, over 90% of our retail users had found us organically or through word-of-mouth, reflecting the strength of our brand. We plan to make investments to efficiently drive retail user growth by expanding our marketing efforts across new and existing digital and offline channels.

101.     The statements identified above in Paragraph 100 were false and/or materially misleading. The above statements indicated that Coinbase "plan[ned]" to "expand[] . . . marketing efforts" in the future, which indicated that the company's primary means of customer outreach were still "organic[]" and by "word-of-mouth." However, as alleged in Section IV.B., *supra*, Coinbase was no longer attracting new users predominantly through "organic[]" means or "word-of-mouth." Defendants had already changed their outreach strategy with the commencement of their advertising and marketing push beginning in 3Q20 and continuing through the Direct Listing in 2Q21. Coinbase's "sales and marketing expenses" increased from under $12 million in 3Q20 to nearly $200 million in 2Q21 due to increases in "digital advertising spend" and "customer referral and promotion fees." Further, whereas Coinbase traditionally "spent less than 5% of net revenue on sales and marketing," it had spent 7.3% in 1Q21 and 9.6% in 2Q21.

102.    In addition to the foregoing, the Registration Statement failed to adequately describe the rising trend in "technology and development expenses" and "sales and marketing expenses" beginning in 3Q20 and continuing through 2Q21 in accordance with Item 303 of Regulation S-K, 17 CFR §229.303. As alleged above in Section IV.B., *supra*, these expenses "trended upwards" due to "the timing and magnitude of online advertising campaigns to increase traffic to [Coinbase's] platform." This trend continued into 1Q21 and 2Q21. The expenses as a percentage of net revenue increased from less than 5% prior to the Direct Listing to 7.3% in 1Q21 and then 9.6% in 2Q21 (*i.e.*, the quarter in which the Direct Listing occurred) and amounted to a material change in business strategy and operational costs relative to historical periods.

103.    The Registration Statement's omission of the "unanticipated system disruptions" during 1Q21 also constituted a violation of Item 303 of Regulation S-K, 17 CFR §229.303. As alleged above in Section IV.C., *supra*, Coinbase's experienced six disruptions in 2019 and twelve in 2020; in 1Q21 alone, Coinbase experienced five, which represented a sharp uptick in the rate and frequency of the disruptions in general. The disruptions constituted "unusual or infrequent events" that were material in terms of both the overall number of disruptions as well as the impact they would have on Coinbase's income given that the "other operating expense" associated with the disruptions amounted to approximately 22.8% of Coinbase's overall net income for the quarter.

104.    The Registration Statement also violated Item 105 of Regulation S-K, 17 CFR §229.105, by failing to disclose the specific risks arising from Coinbase's promotional campaign in advance of the Direct Listing and, in turn, the deterioration of its "platform" and central "flywheel" growth strategy. Coinbase's decision to increase users on its "platform" through the promotional and advertising campaign discussed in Section IV.B., *supra*, marked a material change in its business and growth strategy which had previously been "organic[] or through word-of-mouth." The "risk factors" contained in the Registration Statement did not disclose the material adverse impacts of this change in strategy or Coinbase's recent and significant influx of customers, including in particular the strain on Coinbase's "platform" that resulted in increased system disruptions, delayed crypto asset offerings, and the breakdown of its traditional "flywheel" growth strategy.

1    Although these adverse effects had already occurred by the time of the Direct Listing, Coinbase did

2    not disclose them and/or referred to them only generally and as risks that had not yet materialized.

3                                           *         *         *

4         105.    Coinbase cultivated an image of stability and security based on its proprietary and

5    trusted "platform" and proven "flywheel" growth strategy. The Registration Statement repeatedly

6    emphasized these core components of the business and identified them as the defining features of

7    Coinbase's competitive advantage and business model. Contrary to what was stated in the

8    Registration Statement, Plaintiff and other similarly situated investors who purchased Coinbase

9    shares in the Direct Listing unknowingly invested in a company that did not have the cornerstones

10   of its traditional operations in place and were not functioning as depicted in prior periods. Instead,

11   the components of Coinbase's business that Defendants referred to as its key competitive advantages

12   and/or strengths were broken and materially weakened as a result of Defendants' promotional

13   actions occurring prior to and during the Direct Listing which marked a fundamental change in

14   Coinbase's business strategy relative to what was described in the Registration Statement.

15        106.    The truth about these central components of Coinbase's operations would have, for

16   a reasonable investor, significantly altered the total mix of information made available in the

17   Registration Statement. When Coinbase reported its 1Q21 earnings after market hours on May 13,

18   2021, the effects of Coinbase's promotional and advertising campaign became known and the

19   market reacted accordingly. As alleged above in Section IV.C., *supra*, Coinbase missed analyst

20   expectations, reported increased "unanticipated system disruptions," and announced that it was

21   attempting to increase the speed with which it would list new crypto assets, including Dogecoin

22   which Coinbase said would not be listed for at least another six weeks despite its widespread demand

23   and popularity. This information led to a material and statistically significant decline in the price of

24   Coinbase's stock as analysts and investors reassessed the value of its shares.

25   **V.    CLASS ACTION ALLEGATIONS**

26        107.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

27   of Civil Procedure on behalf of herself and all persons or entities who purchased or otherwise

28

Consolidated Class Action Complaint                          Master Case No. 3:21-cv-05634-VC

acquired Coinbase's publicly-traded common stock pursuant and/or traceable to the Registration Statement on or after April 14, 2021, and who were damaged thereby (the "Class"). Excluded from the Class are each of the Defendants, their respective successors, assigns, parents and subsidiaries, the past and current executive officers and directors of Coinbase, the legal representatives, heirs, successors or assigns of the Individual Defendants, and any entity in which any of the foregoing excluded persons have or had a majority ownership interest.

108.   The members of the Class are so numerous that joinder of all members is impracticable. The precise number of Class members is unknown to Plaintiff at this time, but it is believed to be in the hundreds of thousands. Coinbase registered over 114 million shares of Coinbase Class A common stock in the Direct Listing. Members of the Class may be identified by records maintained by Coinbase or its transfer agents and may be notified by the pendency of this action by mail, using a form of notice customarily used in securities class actions.

109.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the Defendants' respective wrongful conduct in violation of the federal laws complained of herein.

110.   Plaintiff has and will continue to fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

111.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.   whether Defendants violated the federal securities laws as alleged herein;

b.   whether the Registration Statement issued by Defendants to the investing public omitted and/or misrepresented material facts about Coinbase and its business, operations, or prospects; and

c.   whether the members of the Class have sustained damages and, if so, the proper measure of damages.

112.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

**FOR VIOLATION OF SECTION 11 OF THE SECURITIES ACT**

**(Against Coinbase and the Individual Defendants)**

113.    Plaintiff repeats and realleges each and every allegation contained above. Plaintiff specifically disclaims any allegations that are based on fraud, recklessness, or intentional misconduct.

114.    This count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of Plaintiff and other members of the Class, against Coinbase and the Individual Defendants.

115.    The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

116.    Coinbase is the issuer of the securities purchased by Plaintiff and other members of the Class. As such, Coinbase is strictly liable for the materially untrue statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate.

117.    The Individual Defendants each signed the Registration Statement. As such, each is strictly liable for the materially inaccurate statements contained therein and the failure of the Registration Statement to be complete and accurate. The Individual Defendants named herein were responsible for the contents and dissemination of the Registration Statement, which were inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein. The Individual Defendants each had a duty to make a reasonable and diligent investigation

27

of the truthfulness and accuracy of the statements contained in the Registration Statement and ensure that they were true and accurate and not misleading. In the exercise of reasonable care, the Individual Defendants should have known of the material misstatements and omissions contained in the Registration Statement. Accordingly, the Individual Defendants are liable to Plaintiff and the other members of the Class.

118.    By reason of the conduct alleged herein, each Coinbase and the Individual Defendants violated Section 11 of the Securities Act.

119.    Plaintiff and the other members of the Class acquired Coinbase common stock pursuant or traceable to the Registration Statement and without knowledge of the untruths and/or omissions alleged herein. Plaintiff and the other members of the Class sustained damages, and the price of Coinbase's shares declined substantially due to material misstatements in the Registration Statement.

120.    This claim was brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the Direct Listing.

121.    By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under Section 11, as measured by the provisions of Section 11(e), from the Defendants and each of them, jointly and severally.

## COUNT II

### FOR VIOLATION OF SECTION 12 OF THE SECURITIES ACT

### (Against Coinbase and the Individual Defendants)

122.    Plaintiff repeats and realleges each and every allegation contained above. Plaintiff specifically disclaims any allegations that are based on fraud, recklessness, or intentional misconduct.

123.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of the Class, against each of Coinbase and the Individual Defendants.

124.    Coinbase and the Individual Defendants were sellers, offerors, and/or solicitors of purchasers of Coinbase's Class A common stock offered pursuant to the Direct Listing.

125.    The Registration Statement was used to induce investors, such as Plaintiff and the other members of the Class, to purchase the shares in the Direct Listing. Coinbase and certain of the Individual Defendants also held presentations, such as the Coinbase Investor Day YouTube Presentation on March 23, 2021, further intended to actively solicit buyers.

126.    Coinbase and the Individual Defendants were financially motivated to solicit sales of the Class A common stock. The Direct Listing provided each of the Individual Defendants with liquidity for their Class A common stock that otherwise would not have been available. Thus, the following Individual Defendants, among others, were able to sell their stock without any restrictions immediately upon execution of the Direct Listing:

    a.    Armstrong, who held 33,988,966 shares of registered Class A common stock;

    b.    Andreessen, who held 52,768,137 shares of registered Class A common stock;

    c.    Ehrsam, who held 15,114,503 shares of registered Class A common stock; and

    d.    Haun, who held 482,092 shares of registered Class A common stock;

127.    Several of the Individual Defendants, in fact, sold their newly registered Class A common stock, including:

    a.    Andreessen, who sold $112,309,275 of shares on April 14, 2021 and $6,346,474 on April 15, 2021;

    b.    Armstrong, who sold $291,827,963 of shares on April 14, 2021;

    c.    Ehrsam, who sold $91,564,988 of shares on April 14, 2021 and $86,554,159 of shares over the course of the next several days;

    d.    Haas, who sold $99,320,788 of shares on April 14, 2021;

    e.    Haun, who sold $73,517,983 of shares on April 14, 2021; and

    f.    Jones, who sold $43,435,000 of shares on April 14, 2021.

128.    The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state

material facts required to be stated therein. Coinbase's and the Individual Defendants' acts of solicitation included participating in the preparation of the false and misleading Registration Statement.

129.    Coinbase and the Individual Defendants owed Plaintiff, and the other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Neither Coinbase nor the Individual Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate and complete in material respects. Had they done so, Coinbase and the Individual Defendants would have known of the material misstatements and omissions alleged herein.

130.    Plaintiff and the other Class members did not know, nor in the exercise of reasonable diligence could have known, of the material untruths and omissions contained in the Registration Statement.

131.    By reasons of the conduct alleged herein, Coinbase and the Individual Defendants violated Section 12(a)(2) of the Securities Act.

132.    As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased Coinbase common stock pursuant to the Registration Statement sustained substantial damages in connection with their purchases of stock. Accordingly, Plaintiff and the other members of the Class who hold Coinbase stock issued pursuant to the Registration Statement have the right to rescind and recover the consideration paid for their shares, and hereby tender their Coinbase shares to Defendants sued herein. Class members who have sold their Coinbase stock seek damages to the extent permitted by law.

133.    This claim was brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the Direct Listing.

Consolidated Class Action Complaint                    Master Case No. 3:21-cv-05634-VC

1

2

3

# COUNT III

## FOR VIOLATION OF SECTION 15 OF THE SECURITIES ACT

### (Against the Individual Defendants)

4    134.    Plaintiff repeats and realleges each and every allegation contained above. Plaintiff

5 specifically disclaims any allegations that are based on fraud, recklessness, or intentional

6 misconduct.

7    135.    This Count is brought by Plaintiff against the Individual Defendants pursuant to

8 Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the Class.

9    136.    This Count is asserted against the Individual Defendants, each of whom was a control

10 person of Coinbase during the relevant time period.

11    137.    The Individual Defendants were each control persons of Coinbase by virtue of their

12 positions as directors, senior officers, and/or authorized representatives of Coinbase. The Individual

13 Defendants had the power to influence, and did in fact exercise control over the Company to cause

14 it to engage in the conduct complained of herein. Similarly, each of the other Individual Defendants

15 not only controlled those subject to liability as primary violators of Section 11 of the Securities Act,

16 as alleged above, they directly participated in controlling Coinbase by having signed, or authorized

17 the signing of, the Registration Statement and authorizing the resale of Coinbase securities to

18 Plaintiff and members of the Class.

19    138.    As control persons of Coinbase, each of the Individual Defendants are jointly and

20 severally liable pursuant to Section 15 of the Securities Act with and to the same extent as Coinbase

21 for its violations of Section 11 of the Securities Act.

22    139.    As a direct and proximate result of said wrongful conduct, Plaintiff and the other

23 members of the Class suffered damages in connection with their purchase or acquisition of Coinbase

24 common stock.

25

26

27

28

Consolidated Class Action Complaint                    Master Case No. 3:21-cv-05634-VC

## VI.    PRAYER FOR RELIEF

140.    Plaintiff demands judgment against Defendants as follows:

a.    determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiff as class representative and certifying lead counsel as class counsel;

b.    requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

c.    awarding Plaintiff and the Class prejudgment and post-judgment interest, as well as their reasonable counsel fees and expert fees, and other costs and expenses reasonably incurred by this action; and

d.    awarding such other relief as the Court may deem just and proper.

## VII.    JURY DEMAND

141.    Plaintiff hereby demands a trial by jury.

DATED:  December 20, 2021

LEVI & KORSINSKY, LLP

By:  *s/ Adam M. Apton*
Adam M. Apton (SBN 316506)
75 Broadway, Suite 202
San Francisco, California 94111
Telephone: (415) 373-1671
Email: aapton@zlk.com

*Attorneys for Lead Plaintiff Hsiu-Mei Yu and Lead Counsel for the Class*